UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN STATE AFL-CIO, et al.,

      Plaintiffs,                        Case No. 13-cv-10557

v.                                  HONORABLE STEPHEN J. MURPHY, III

EDWARD D. CALLAGHAN, et al.,

      Defendants.

_____/

### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANTS' MOTION TO DISMISS (document no. 17)

In December 2012, Michigan enacted Public Act 348 of 2012 ("PA 348") (codified at Mich. Comp. Laws §§ 423.1, *et seq.*). The law describes employees' labor rights, prescribes certain conditions of employment, and prohibits certain coercive practices. PA 348 also provides civil and criminal remedies to redress violations of the law. After the law's passage, labor organizations sued state and local officials for a declaration that federal law preempts PA 348 and for an injunction against its enforcement. The defendants move to dismiss.[1] For the reasons stated below, the Court will grant the motion in part and deny it in part.

### BACKGROUND

With the passage of PA 348, Michigan became one of the twenty-four states that regulate union-security agreements. A feature common to Michigan's "freedom to work" law and others like it is a prohibition on agreements making union membership a condition of employment. *See* Mich. Comp. Laws § 423.14(1)(b); James R. Eissinger, *The Right-to-*

_____

[1] Although the Wayne County prosecutor, Kym L. Worthy, did not sign the written motion to dismiss, her attorney stated at oral argument that she was joining the motion. The plaintiffs did not object.

*Work Imbroglio*, 51 N.D L. Rev. 571, 573–74 (1975) (describing right to work laws generally).

PA 348 also articulates other labor policies. PA 348, for example, declares that employees have a right to organize, undertake concerted activity and bargain collectively through freely chosen representatives. Mich. Comp. Laws § 423.8.  Elsewhere, PA 348 prohibits "condition[s] of obtaining or continuing employment" that require workers to refrain from joining or supporting a labor organization, to join or remain a member of a labor organization, pay dues or anything of value to a labor organization, or pay third-parties a charge in lieu of union dues. Mich. Comp. Laws § 423.14(1). And another section prohibits coercion designed to compel workers to join, leave, or support a labor organization. Mich. Comp. Laws § 423.17(1).

Each of these prohibitions are enforceable through various means. PA 348 authorizes state courts to grant "any appropriate legal or equitable remedy," limits the enforcement of some contracts, authorizes civil fines for certain violations, and makes conspiring to violate the law a misdemeanor. Mich. Comp. Laws §§ 423.14(2), (5)–(6), 423.17(2), 423.22(3), 423.24.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12 permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under this standard, dismissal is appropriate if — taking all well-pleaded factual allegations as true and drawing all reasonable inferences for the non-moving party — the claimant could not recover under a viable legal theory. *See Hunter v. Sec'y of the U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009); *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008).

2

**DISCUSSION**

The plaintiffs argue that PA 348 is invalid on its face for three reasons. The first is that PA 348 regulates conduct that *San Diego Bldg. Trades v. Garmon*, 359 U.S. 236 (1959), makes subject to the federal government's exclusive jurisdiction. The second is that federal regulation of collective bargaining agreements preempts the section of PA 348 that regulates contracts containing illegal conditions of employment. And the third is that PA 348 improperly regulates conduct on federal enclaves. Only the first theory has merit.[2]

I.   Federal-State Power over Labor Relations

While distinct, the plaintiffs' first two theories both turn on the balance federal labor law strikes overall between federal and state power. Hence, the Court will briefly consider this subject before examining the specific preemption arguments.

In 1935, Congress enacted the National Labor Relations Act ("NLRA"), Pub. L. 74-189, 49 Stat. 449 (1935). Broadly speaking, the NLRA — also known as the Wagner Act — articulated a national labor policy and created the National Labor Relations Board ("NLRB") to implement it. *See N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 22–24 (1937) (sketching the Wagner Act). But while Sections 7 and 8 of the Wagner Act described federal policy towards employee rights and unfair labor practices, the law said little about the respective roles of federal and state officials in regulating these areas. *See Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 771 (1947) ("Congress has not seen fit to lay down even the most general of guides to construction of the Act, as it

_____

[2] The parties reserve the question of whether preempted portions of PA 348 are severable for subsequent motion practice.

3

sometimes does, by saying that its regulation either shall or shall not exclude state action."). Congress's silence thus left open the validity of state right to work laws.

Interpreting Section 8(3) of the Wagner Act, however, the Supreme Court held that Congress has not preempted state regulation of union security agreements. *See Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Bd.*, 336 U.S. 301 (1949). Section 8(3) of the Wagner Act forbade employers from discriminating against employees based on union membership or non-membership, but provided that the section should not be interpreted to prevent employers and labor organizations from agreeing to make union membership a condition of employment. *See id.* at 307. The Supreme Court read this proviso merely to "disclaim[] a national policy hostile to the closed shop" and "other forms of union-security agreement[s]." *Id.*; *see also N.L.R.B. v. General Motors Corp.*, 373 U.S. 734, 739–40 (1963). So interpreted, the Wagner Act then left states "free to pursue their own more restrictive policies on the matter of union-security agreements." *Algoma Plywood*, 336 U.S. at 307; *see also id.* at 305–13.

Over a decade after passing the Wagner Act, Congress amended the NLRA with the Taft-Hartley Act. Labor Management Relations Act (Taft-Hartley Act), Pub. L. 80-101, 61 Stat. 136 (1947). The amendments left intact the prohibition against discrimination based on union-membership status, but having found the closed shop susceptible to abuse, Congress outlawed it. *See General Motors*, 373 U.S. at 740–41. Congress accordingly rewrote Section 8(3) — which it renumbered as Section 8(a)(3) — to permit only union-shop and agency-shop arrangements requiring union membership (or its equivalent) no

earlier than 30 days after the start of employment.[3] *Id.*; *see also* 29 U.S.C. § 158(a)(3).

Gone was the language authorizing closed-shop agreements that made union-membership

a condition of obtaining employment. *See N.L.R.B. v. Local Union No. 55*, 218 F.2d 226,

232 (10th Cir. 1954) (recognizing closed shop agreements were made illegal).

But lest the Taft-Hartley Act's detailed regulation of union-security agreements

suggest that Congress had preempted the field, Congress added Section 14(b) to the

NLRA. *Retail Clerks Int'l Ass'n, Local 1625 AFL-CIO v. Schermerhorn* [hereinafter *Retail*

*Clerks II*], 375 U.S. 96, 100–02 (1963). It provides:

> Nothing in this Act shall be construed as authorizing the execution or
> application of agreements requiring membership in a labor organization as
> a condition of employment in any State . . . in which such execution or
> application is prohibited by State . . . law.

Labor Management Relations Act, Pub. L. 80-101, § 14(b), 61 Stat. 136 (codified at 29

U.S.C. § 164(b)).

The Taft-Hartley Act thus expressly preserved a limited role for the states in regulating

labor relations. *See Retail Clerks Int'l Ass'n, Local 1625 AFL-CIO v. Schermerhorn*

[hereinafter *Retail Clerks I*], 373 U.S. 746, 750–52 (1963). It bears repeating, however, that

the states' role is limited. The general rule is that the NLRA preempts state and local

regulations. *See Wisconsin Dep't of Indus., Labor & Human Relations v. Gould, Inc.*, 475

U.S. 282, 286 (1986) (". . . Congress [has] largely displaced state regulation of industrial

relations."); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982) (stating the same); *see*

*also generally* Stanley D. Henderson, *The Confrontation of Federal Preemption and State*

---

[3] Any distinction between the union shop and agency shop is largely formal since
*General Motors* "whittled down [membership] to its financial core." *General Motors*, 373
U.S. at 741–44.

*Right-to-Work Laws*, 1967 Duke L.J. 1079 (1967) (discussing the theory animating labor preemption).

II.    *Garmon* Preemption

Although acknowledging that Section 14(b) permits states to prohibit union-security agreements, the plaintiffs argue that Michigan has regulated beyond this sphere. They thus claim that PA 348 is preempted under *Garmon*.

A.    Scope of *Garmon* Preemption

Articulating one of several types of labor preemption, the settled rule of *Garmon* is that the NLRA preempts state regulation of conduct that it "protects, prohibits, or arguably protects or prohibits." *Chamber of Commerce v. Brown*, 554 U.S. 60, 65–66 (2008); *see also Garmon,* 359 U.S. at 224–25. Not only does this sweeping rule capture the constitutional principle that federal law trumps contrary state regulations, *see Brown v. Hotel & Rest. Employees & Bartenders Int'l Union Local 54*, 468 U.S. 491, 502–03 (1984), but it also carves out a zone for exclusive federal regulation of labor relations, *see Bldg. & Const. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 224 (1993). Even so, it is not a typical field preemption doctrine. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 608–09 (6th Cir. 2004). The primary rationale for *Garmon* preemption is jurisdictional. By creating the NLRB, Congress sought to give a specialized body power to create a uniform scheme of regulation. *See Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776 (A. F. L.)*, 346 U.S. 485, 491 (1953); *Northwestern Ohio Adm'r, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1027 (6th Cir. 2001). *Garmon* preemption is thus designed to preserve the NLRB's primary jurisdiction by generally precluding other governmental entities from regulating

6

activities described in Sections 7 and 8 of the NLRA. *See Gould, Inc.*, 475 U.S. at 286 (recognizing that *Garmon* precludes states from enacting even supplemental remedies); *Garmon*, 359 U.S. at 244–45.

Unlike a typical field preemption doctrine, however, *Garmon* preemption admits exceptions. The NLRB's jurisdiction yields when a regulated activity is a "merely peripheral concern" of the NLRA or affects interests "deeply rooted in local feeling and responsibility." *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 392–93 & n.10 (1986) (quoting *Garmon*, 359 U.S. at 243–44). And, of course, Section 14(b) permits states to regulate conduct that would otherwise fall under the NLRB's jurisdiction. *Retail Clerks II*, 375 U.S. 103–04. This provision is the focus of the parties' arguments here.

As noted above, Section 14(b) limits the preemptive effect of federal law by preserving "state power over certain union-security arrangements." *Retail Clerks I*, 373 U.S. at 751. But its potency is limited. Designed primarily to limit the implications flowing from Section 8(a)(3), which expressly permits union shop and agency shop arrangements, Section 14(b) permits states to regulate only the "execution and enforcement of union-security agreements." *Retail Clerks II*, 375 U.S. at 102. States may not, for instance, regulate pre-hiring conduct subject to federal regulation even if aimed at establishing a union-security arrangement prohibited by state law. *Id.* at 105; *see also Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 417 (1976) ("Since s 8(a)(3) already prohibits the closed shop, the more restrictive policies that s 14(b) allows the States to enact relate not to the hiring process but rather to conditions that would come into effect only after an individual is hired."). And states may not regulate post-hiring conduct unrelated to the validity of a union-security agreement. *See Commc'ns Workers*

*of Am. v. Beck*, 487 U.S. 735, 742 (1988) (concluding that the NLRB had primary jurisdiction over a question about the use of membership dues); *SeaPak v. Indus. Technical & Professional Employees*, 300 F. Supp. 1197, 1200 (S.D. Ga. 1969) (concluding Section 14(b) did not permit state regulation of check-off arrangements), *aff'd* 423 F.2d 1229 (5th Cir. 1970), *aff'd* 400 U.S. 985 (1971).

B.     *Garmon* Preemption Applied to PA 348

Despite these limits, the defendants nevertheless argue that PA 348 fits entirely within Section 14(b). Although this is true of portions of the law, the plaintiffs identify and challenge several sections that do not.[4]

1.   Mich. Comp. Laws § 423.8(b)

PA 348 declares that employees have the rights to organize, take concerted action, and bargain collectively. Mich. Comp. Laws § 423.8(a). While the plaintiffs do not challenge the declaration of rights directly,[5] they argue that a related provision giving employees the right to *refrain* from these activities is preempted. Compl. ¶ 36, ECF No. 1 (challenging Mich. Comp. Laws § 423.8(b)). The Court agrees.

An immediately apparent problem with Michigan's statute is the absence of any language tying the exercise of the employee rights to conditions of employment. By its plain language, Section 14(b) permits states to prohibit only union-security agreements; it does

---

[4] To avoid confusion, specific sections of PA 348 are identified as they appear in the state code.

[5] At oral argument and in their brief, the plaintiffs occasionally state that both subsections (a) and (b) of Mich. Comp. Laws § 423.8 are preempted. The complaint, however, alleges only that subsection (b) is preempted under *Garmon.* Compl. ¶ 36; Compl., Prayer for Relief ¶ 1. The Court thus expresses no opinion on the validity of subsection (a).

8

not give states a broad power to guarantee employees a range of labor rights. *See Stricker v. Swift Bros. Const. Co.*, 260 N.W.2d 500, 503 (S.D. 1977). Disputes about an employee's right to refrain from union activities instead fall squarely within the NLRB's jurisdiction. Using just slightly different terms than PA 348, Section 7 of the NLRA declares that employees may refrain from organizing, taking concerted action, and bargaining collectively. *See* 29 U.S.C. § 157. This parallel language confirms that Michigan has legislated, or at the very least arguably legislated, outside the boundaries of Section 14(b) by authorizing its officials and courts to manage labor relations.

In response, the defendants attempt to turn the parallel structure of state and federal law into a virtue, arguing that there would only be a preemption problem if Michigan had given employees different rights than those secured by the NLRA. Def.'s Br. 7, ECF No. 17. This reasoning, however, ignores the fundamental rationale of *Garmon* preemption. Because *Garmon* preemption seeks to protect the primacy of the NLRB's jurisdiction, states may not enact complementary or supplemental legislation regulating activities under the NLRB's exclusive jurisdiction. *See Gould*, 475 U.S. at 286. The plaintiffs thus have a viable preemption claim against Mich. Comp. Laws § 423.8(b).

      2.  <u>Mich. Comp. Laws § 423.14(1)(a)</u>

Likewise, the plaintiffs bring a viable challenge to Mich. Comp. Laws § 423.14(1)(a). That section of PA 348 forbids conditions of employment that require an individual to "[r]efrain or resign from membership in, voluntary affiliation with, or voluntary financial support of a labor organization." Mich. Comp. Laws § 423.14(1)(a). Although the prohibition concerns conditions of employment, it has no relation to union-security agreements. The regulation instead prohibits conditions of employment that prevent an individual from joining

9

or supporting a labor organization. Section 14(b) plainly does not authorize such a regulation. *See Local 514 Transport Workers Union of America v. Keating*, 358 F.3d 743, 751 (10th Cir. 2004); *Friendly Soc'y of Engravers & Sketchmakers v. Calico Engraving Co.*, 238 F.2d 521, 524–25 (4th Cir. 1956); *Bukovac v. Daniel Const. Co.*, 469 F. Supp. 176, 178–79 (W.D. Va. 1979).

The defendants, however, assert that Mich. Comp. Laws § 423.14(3) cures any preemption problem by stating that Mich. Comp. Laws § 423.14(1)(a) shall be "implemented to the maximum extent permitted by United States constitution and federal law." Mich. Comp. Laws § 423.14(3). There are two problems with the response. The first is that Mich. Comp. Laws § 423.14(3) concerns implementation rather than interpretation. It directs the actions of state officials rather than prevents Mich. Comp. Laws § 423.14(1)(a) from reaching conduct outside of the Michigan's power to regulate. Furthermore, even if Mich. Comp. Laws § 423.14(3) permitted the Court to impose a limiting construction on PA 348, the defendants fail to explain how the Court could construe a provision prohibiting discrimination against union members to comport with Section 14(b) — a section that only authorizes state regulation of union-security agreements.

   3.   Mich. Comp. Laws § 423.17(1)(b)

Nor does Section 14(b) permit Michigan to forbid violence against union supporters. PA 348 prohibits persons from using force, intimidation, and unlawful threats to compel someone to "[r]efrain from engaging in employment or refrain from joining a labor organization or otherwise affiliating with or financially supporting a labor organization." Mich. Comp. Laws § 423.17(1)(b). This legislation too is preempted.

Although the defendants argue that the section is valid mechanism for enforcing Michigan's restrictions on union-security agreements, Mich. Comp. Laws § 423.17(1)(b) sweeps much further. First, rather than merely prohibiting coercion aimed at establishing a de facto union-security agreement — a prohibition which still might be susceptible to a preemption challenge — the regulation here forbids coercion designed to prevent a person from "engaging in employment." Mich. Comp. Laws § 423.17(1)(b). The absence of any language limiting this general restriction to situations involving union-security agreements entails that Section 14(b) cannot save the regulation. And second, Mich. Comp. Laws § 423.17(1)(b) specifically forbids coercion targeting union members and supporters. Like Mich. Comp. Laws § 423.14(1)(a), this prohibition has no relation to any type of union-security agreement. Therefore, Michigan cannot justify the regulation using Section 14(b).

Of course, there may be other reasons that some or all of the prohibition is not preempted. Despite the extensive federal regulation of labor relations, states retain limited power to forbid violent conduct pursuant to their power to act in matters "deeply rooted in local feeling and responsibility." *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 195, 204 & n.35 (1978) (quoting *Garmon*, 359 U.S. at 224) (citing cases). The defendants, however, have not argued that this or any other exception to *Garmon* preemption applies. Hence, the Court will not dismiss the claim challenging Mich. Comp. Laws § 423.17(1)(b).

### 4.  Mich. Comp. Laws § 423.14(1)(c)

But the Court will dismiss the claim that Mich. Comp. Laws § 423.14(1)(c) is invalid. This section of PA 348 forbids conditions of employment that require an individual to pay

"dues, fees, assessments, or other charges or expenses of any kind or amount or provide anything of value to a labor organization." Mich. Comp. Laws § 423.14(1)(c)

States, of course, may prohibit compulsory fee payments under Section 14(b). *See Retail Clerks I*, 373 U.S. at 751–52. But the plaintiffs argue that Mich. Comp. Laws § 423.14(1)(c) is preempted because it restricts valid hiring hall arrangements. Under the NLRA, an employer may enter an exclusive referral agreement that obligates the employer to hire only candidates recommended through a hiring hall and charge participants a fee to cover expenses. *See Laborer's Int'l Union of N. Am. v. Kunco, Inc.*, 472 F.2d 456, 458 (8th Cir. 1973); *N.L.R.B. v. Local 138, Int'l Union of Operating Engineers, AFL-CIO*, 385 F.2d 874, 877 (2d Cir. 1967). The plaintiffs argue that by banning all payments to unions that are a "condition of obtaining . . . employment," Mich. Comp. Laws § 423.14(1)(c) attempts to supplement federal regulation of hiring halls and, thus, is preempted. Pl.'s Br. 13–17, ECF No. 32.

Albeit a sophisticated argument, it mistakenly presumes that Mich. Comp. Laws § 423.14(1)(c) prohibits fees paid during a hiring hall. The plaintiffs essentially read Mich. Comp. Laws § 423.14(1)(c) as prohibiting all payments to unions made in the course of obtaining employment. The statute, however, only prohibits payments to unions required as a "condition of obtaining . . . employment." Mich. Comp. Laws § 423.14(1). The word "condition" qualifies the rest of the phrase. And because conditions concern job requirements, prerequisites, and qualifications, it would strain the meaning of "condition" to read the statute as embracing rules made by the labor organization running a hiring hall without evidence that the employer required or helped make those rules. The Court thus interprets Mich. Comp. Laws § 423.14(1)(c) as targeting the closed shop, making it roughly

12

coterminous with other state laws prohibiting agreements that make union membership a "condition of employment or continuation of employment." *E.g.*, Ind. Code § 22-6-6-8.

Such laws are a valid exercise of state regulatory power under Section 14(b). Prior to the enactment of Section 14(b), federal law expressly authorized closed shop agreements, which permitted employers to hire only those who were already union members. *Beck*, 487 U.S. at 747. State laws restricting union-security agreements thus commonly banned both agreements making union membership a "condition of employment" and agreements making union membership a "condition of . . . continuation of employment." *See Int'l Union of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Canada, Local Unions Nos. 141, 229, 681 & 706 v. N.L.R.B.*, 675 F.2d 1257, 1260 (D.C. Cir. 1982) (describing a typical state law at the time). The former targeted the closed shop; the latter less stringent union-security agreements.

The Taft-Hartley Act later amended the NLRA to make closed-shop agreements illegal. No longer permitting employers to make union membership a prerequisite of employment, Congress rewrote Section 8(3) to authorize only union shop and agency shop arrangements. *See General Motors*, 373 U.S. at 740–41. Valid union-security agreements accordingly may require employees to become a union member or pay a fee to cover collective bargaining costs no earlier than 30 days after the start of employment. *Id.* But while the arrangements valid under federal law changed with the Taft-Hartley Act, Congress left intact state prohibitions on closed-shop arrangements. When passing the Taft-Hartley Act, Congress was well aware that twelve states had right to work laws restricting closed-shop arrangements. *See Retail Clerks II*, 375 U.S. at 101–02; *Int'l Union*

13

*of the United Ass'n of Journeymen*, 675 F.2d at 1272–74 (Mikva, J., dissenting) (observing that congressional discussions of Section 14(b) focused on how it preserved state power over the closed shop). Congress accordingly worded Section 14(b) broadly enough to preserve state power to prohibit compulsory unionism in all of its forms by addressing it to "condition[s] of employment," not just conditions for continuing employment. 29 U.S.C. § 164(b); *see also Retail Clerks II*, 375 U.S. at 101–02 (observing that Congress thought the Taft-Hartley Act did not alter state power over union-security arrangements); *Lord v. Local Union No. 2088, Int'l Bhd. of Elec. Workers, AFL-CIO*, 646 F.2d 1057, 1063 n.10 (5th Cir. 1981) (making the same observation); *N.L.R.B. v. Houston Chapter, Associated Gen. Contractors of Am., Inc.*, 349 F.2d 449, 453 (5th Cir. 1965) ("It is true that the terms of § 14(b) as well as the legislative history suggest the intent on the part of Congress to save to the states the right to prohibit compulsory unionism.").

Therefore, because Mich. Comp. Laws § 423.14(1)(c) regulates closed-shop arrangements that states may restrict under Section 14(b), the Court will dismiss the plaintiffs' claim that the state regulation is preempted.

### 5. Enforcement Mechanisms

In challenging PA 348, the plaintiffs also argue that the civil and criminal remedies enforcing PA 348 are preempted. While states may not attempt to enforce preempted regulations, states may enforce regulations authorized by Section 14(b). *See Retail Clerks II*, 375 U.S. at 102–03. The validity of a remedy thus depends in the first instance on what it enforces. Because the remedies challenged here enforce both preempted and valid sections of PA 348, the enforcement mechanisms are not preempted on their face. Instead,

14

their validity hinges on the severability of the preempted portions of PA 348 from the remainder of the law, which, as noted above, is a question for another day.

III.   Section 301 Preemption

The plaintiffs' second theory is that Section 301 preempts Mich. Comp. Laws § 423.14(2), which declares unenforceable any "agreement, contract, understanding, or practice" that violates Mich. Comp. Laws § 423.14(1). The Court disagrees.

Section 301(a) of the NLRA gives federal district courts jurisdiction over "[suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). Although Section 301 speaks only of jurisdiction, the Supreme Court has interpreted it to require both federal and state courts to apply federal common law to resolve disputes involving collective bargaining agreements. *See Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103–04 (1962); *Textile Workers v. Lincoln Mills of Am.*, 353 U.S. 448, 453–54, 456 (1957). Section 14(b) limits the preemptive effect of Section 301. *See Retail Clerks II*, 375 U.S. 96 (permitting a state court to declare an agency shop clause in a collective bargaining agreement illegal). But the plaintiffs argue that Mich. Comp. Laws § 423.14(2) regulates outside of Section 14(b), because it requires courts to invalidate any writing that contains an unenforceable provision. Pl.'s Br. 18.

The argument misinterprets Mich. Comp. Laws § 423.14(2). The plaintiffs admit that "contract" may have two meanings: it may refer to an agreement that creates an obligation between parties or a "writing which contains the agreement of parties." Pl's Br. 18 (quoting *Black's Law Dictionary* 322 (6th ed., 1990)). And despite the existence of two meanings, the plaintiffs assume that PA 348 uses "contract" in the second sense. That conclusion,

however, ignores the "familiar principle" of statutory interpretation that words in a list should be read together. *G.C. Timmis & Co. v. Guardian Alarm Co.*, 468 Mich. 416, 422 (2003). Here, "contract" appears in the middle of a series of words that do not refer to an entire writing. Furthermore, the plaintiffs' interpretation of "contract" leaves unexplained how an entire writing can be a "contract . . . *that* violates" Mich. Comp. Laws § 423.14(1). Mich. Comp. Laws § 423.14(2) (emphasis added). While portions of a collective bargaining agreement, such as a union-shop clause, might certainly violate Mich. Comp. Laws § 423.14(1), it is unclear how an entire collective bargaining agreement would do so. Therefore, the Court will dismiss the plaintiffs' claim that Section 301 invalidates Mich. Comp. Laws § 423.14(2).

IV.   <u>Federal Enclave</u>

The plaintiffs' third theory is that PA 348 is invalid because it applies to federal enclaves subject to the federal government's exclusive jurisdiction. It is undisputed that the Constitution of the United States permits Congress to exercise partial or exclusive jurisdiction over federal enclaves. *See Kleppe v. New Mexico*, 426 U.S. 529, 542 (1976). And the parties agree that a state's right to work law is not enforceable in enclaves where Congress has not permitted states to exercise concurrent jurisdiction. *See N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1191 (10th Cir. 2002) (en banc); *Lord*, 646 F.2d at 1062. But it does not follow from these principles that PA 348 is invalid on its face.

There are multiple reasons for rejecting the third theory. The first is that PA 348 may apply on some federal enclaves where Congress has permitted Michigan to exercise concurrent jurisdiction. Another is that the law's applicability to workers operating on an exclusive federal enclave will depend on the facts of any case. For example, workers

whose principal job situs is not on a federal enclave may be subject to PA 348 even if they perform some work an exclusive federal enclave. *See Oil, Chemical, & Atomic Workers*, 426 U.S. at 414–21. And one other reason is that PA 348 does not purport to apply to workers on exclusive federal enclaves. Even so, the plaintiffs argue that a limiting construction is appropriate. Pl.'s Br. 4 n.3. But the Court hesitates to accept a theory that would authorize federal courts to put limiting constructions on every state law that lacks a provision expressly limiting its jurisdictional reach. In that sense, the plaintiffs' argument is more appropriately made in an as-applied challenge.

**CONCLUSION**

Although the Section 301 and federal enclave preemption theories are not viable, the plaintiffs plead sufficient facts to show that certain portions of PA 348 are preempted vis-a-vis workers subject to the NLRB's jurisdiction. The Court will thus dismiss only Counts III, V, and VII of the complaint.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that the defendants' motion to dismiss (document no. 17) is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: March 31, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 31, 2014, by electronic and/or ordinary mail.

s/Carol Cohron
Case Manager